1                  UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                     )
     SHENZHEN ROOT TECHNOLOGY        )
4    CO., LTD., et al.,              )
                                     )
5          Plaintiffs,               )
                                     )  C23-631-KKE
6     v.                             )
                                     )  Seattle, Washington
7    CHIARO TECHNOLOGY LTD.,         )
                                     )  March 22, 2024
8          Defendant.                )  2:30 p.m.
     _____     )
9                                    )  Discovery Hearing
     CHIARO TECHNOLOGY LTD.,         )  (via Zoom)
10                                   )
           Counterclaim Plaintiff,   )
11                                   )
      v.                             )
12                                   )
     SHENZHEN ROOT TECHNOLOGY        )
13   CO., LTD., et al.,              )
                                     )
14         Counterclaim Defendants.  )
     _____

15
                  VERBATIM REPORT OF PROCEEDINGS
16          BEFORE THE HONORABLE KYMBERLY K. EVANSON
                  UNITED STATES DISTRICT JUDGE
17   _____

18

19

20

21

22

23

24

25        Proceedings stenographically reported and transcript
              produced with computer-aided technology

1

2    APPEARANCES:

3

4    For the Plaintiffs        JEREMY ROLLER
     and Counterclaim          Arete Law Group
5    Defendants:               1218 3rd Ave., Suite 2100
                               Seattle, WA 98101
6
                               QIANWU YANG
7                              SHM Law Firm
                               3000 El Camino Real
8                              Building 4, Suite 200
                               Palo Alto, CA 94306
9
     For the Defendant         NIRAV N. DESAI
10   and Counterclaim          Sterne, Kessler, Goldstein & Fox
     Plaintiff:                1101 K Street NW, 10th Floor
11                             Washington, D.C. 20005

12                             MARK P. WALTERS
                               Lowe Graham Jones
13                             1325 Fourth Ave., Suite 1130
                               Seattle, WA 98101

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    MARCH 22, 2024 - AFTERNOON SESSION
2                         *   *   *   *   *   *
3           THE DEPUTY CLERK:  Please come to attention.  The
4    United States District Court for the Western District of
5    Washington is now in session, the Honorable Judge Kymberly K.
6    Evanson presiding.
7        Now calling case C23-0631, assigned to this Court,
8    Shenzhen Root Technology Co. versus Chiaro Technology
9    Limited.
10       May I have appearances, please?
11          MR. WALTERS:  Good afternoon, Your Honor.  Mark
12   Walters for the defendant, and I'm local counsel here, and
13   Nirav Desai will handle the argument for defendants.
14          MR. DESAI:  Good morning, Your Honor.  This is Nirav
15   Desai from Sterne, Kessler, Goldstein & Fox on behalf of
16   defendants, as Mark said, and with me is my associate, Zach
17   Jacobs.
18          THE COURT:  Great.  Good afternoon, Counsel.
19          MR. JACOBS:  Good afternoon, Your Honor.
20          MR. ROLLER:  Good afternoon, Your Honor.  Jeremy
21   Roller on behalf of the Momcozy parties, and with me is Yang
22   Qianwu, who is in China.  It's about 5:30 in the morning for
23   him.  I think I will be doing most of the speaking today on
24   our behalf, but with the Court's indulgence, there may be
25   some clarification that Mr. Qianwu can provide.
```

1          THE COURT:  That's fine.

2      All right.  Everyone, thank you so much, and thank you in

3  particular to Mr. Qianwu for being here so early in the

4  morning and participating in the Court's discovery procedure

5  for discovery disputes.

6      So my hope is that we can have a conversation today,

7  identify the issues that are actually in dispute, and save

8  the parties and the Court time and resources as we help you

9  move your case forward.

10      I understand that we're here on a dispute with respect to

11  the drafting of your ESI order and whether the Momcozy

12  parties, both plaintiffs and defendants, should be required

13  to search the personal devices of certain executives with

14  respect to the WeChat messages.

15      So I will go ahead and hear from the parties.  I do have

16  some questions.  I think it probably makes sense for counsel

17  for Elvie to go first since you're the proponent of the

18  information, you're seeking the information, so I will go

19  ahead and hear from you and then hear from you, Mr. Roller,

20  with respect to the objection to providing that information.

21          MR. DESAI:  Sure, absolutely, Your Honor.  Thank you.

22  Again, Nirav Desai on behalf of Defendant and Counterclaim

23  Plaintiff Elvie.

24      The parties have been negotiating an ESI stipulation based

25  on the Court's model, and in the context of that discussion,

1   we inquired with Momcozy whether they conduct business

2   communications over WeChat.  I don't know if Your Honor is

3   familiar with WeChat.  It's basically an app that does

4   messaging as well as social media and even payments, mobile

5   payments, and it's used pervasively in China.

6       It's also very commonly used as a, sort of, primary

7   communication for -- communication channel for business in

8   China, and that appears to be the case here in discussing the

9   issue with Momcozy's counsel.  Momcozy counsel represented to

10  us that about 30 percent of communication -- of Momcozy's

11  business communication occurs over WeChat.

12      So, when we indicated that, in our view, that meant that

13  there's very likely to be relevant information in Momcozy

14  payments or in WeChat messages, Momcozy did, then, sort of

15  walk back that 30 percent number, but without really directly

16  addressing what the actual usage is.

17      In addition to that 30 percent figure, Elvie also

18  identified that at least one Momcozy entity has a

19  publicly-facing WeChat channel that they use to solicit

20  customer feedback and customer inquiries, and so, in our

21  view, Momcozy's WeChat messages are very likely to contain

22  information relevant to this case.

23      In the discovery dispute letter, Your Honor probably saw

24  that Momcozy references specifically the willful infringement

25  allegation that we've raised, and certainly, you know, the

1   contact between the parties in this case goes back to

2   June 2022, when we first raised in our cease-and-desist

3   letter our allegation of potential infringement.  So, yes, we

4   think that there's likely to be communications over WeChat

5   related to the local infringement issue, but that's just one,

6   I think, claim in this case that is likely to be important

7   here.  There's probably communications related to

8   infringement, to copying, to sales and marketing, to damages,

9   given the, sort of, 30 percent figure and the fact that they

10  use WeChat as a publicly-facing channel.  There's --

11          THE COURT:  So -- oh, go ahead.  Please continue.

12          MR. DESAI:  I was just going to say that, in

13  response, there have been some -- in the letter and in our

14  discussions, there have been some, sort of, vague allusions

15  to concerns about Chinese privacy laws or personal

16  information.  We've been very up-front that we're not looking

17  for personal information here.  We're happy to work as the

18  model ESI order suggests.  We're happy to work with Momcozy

19  to use targeted search terms or kind of narrow our focus on

20  particular Momcozy execs or employees, but Momcozy has kind

21  of drawn a pretty hard line in the sand that they just won't

22  turn over anything related to WeChat, whether or not there

23  is, you know, relevant information, and so that kind of led

24  us to raise this issue with the Court to try to get some --

25          THE COURT:  Counsel, you're frozen on my end.

1          MR. DESAI:  Can you hear me?

2          THE COURT:  I'm not sure if this is our internet or

3     yours.

4          THE DEPUTY CLERK:  Judge, you're frozen.

5          MR. DESAI:  It sounds like we can all hear each

6     other.

7          THE DEPUTY CLERK:  Give us one second, guys.

8          MR. DESAI:  Are we back?

9          THE COURT:  Yes.  I'm not sure what exactly happened

10    there, but Mr. Desai froze for a moment, and then I got

11    kicked out.  So I'm not sure what happened on your end, but

12    we're back on.

13       Okay.  Mr. Desai, I'm sorry for the interruption.  Please

14    go ahead.  You were just discussing identifying the key

15    executives.

16          MR. DESAI:  Yes.  So, as I was just saying -- and

17    maybe that's my cue to wind it up -- but I was just saying

18    we're willing to work with Momcozy to use targeted search

19    terms to identify key execs to make sure that we're not

20    getting personal information.  We're not looking for dinner

21    plans or anything like that.  We just want messages that are

22    relevant to infringement, relevant to Elvie, relevant to our

23    patents, things of that nature, and we're absolutely willing

24    to work with them on that.  So maybe I'll leave it there and

25    take any questions.

1      THE COURT:  Sure.  So are you proposing that the key

2  executives at Momcozy, that they search their own accounts

3  and provide information or that they make those accounts or

4  devices accessible to a third-party vendor and run search

5  terms?  I've seen multiple approaches in the case law, so

6  what proposal, practically speaking, are we talking about

7  here?

8      MR. DESAI:  I think our proposal would be that WeChat

9  messages should be treated like any other kind of

10  electronically-stored information.  So, you know, however

11  emails are being collected and electronic documents are

12  collected, then WeChat would be collected in that way too.

13      THE COURT:  Is the argument that the WeChat messages

14  are personal accounts, so they're not in the custody and

15  control of Momcozy?  Is that the argument?

16      MR. DESAI:  That is one of the responsive arguments,

17  and certainly, you know, that's not an issue that's unique to

18  WeChat.  You know, courts wrestle with that with U.S.-based

19  text-messaging platforms.

20    I think the key difference here is that we know that

21  WeChat is being used for business communications, and even

22  when, in the normal context, if you're using your text -- you

23  are using your phone to text business communications, that

24  pulls those communications into the purview of discovery.

25  And that's, in fact, why a lot of companies have policies

1   saying don't use your personal devices, use company channels

2   to conduct business communications.

3       In this case, it seems like -- and it's not something

4   that's unique to Momcozy -- it seems like it's something

5   that's actually very common among companies located in China,

6   is that WeChat is just one of the kinds of -- one of the

7   forms of business communication tools that Momcozy has used.

8           THE COURT:  Sure.  And what's your response to

9   Momcozy that, you know, if they have to pull out these WeChat

10  messages, then Elvie has to provide its Slack channel search

11  itself.

12          MR. DESAI:  Sure.  So our use of -- so, first of all,

13  we have not drawn a hard line in the sand saying we're not

14  willing to do that, but our Slack communication is used quite

15  differently.  It's not used for external communication the

16  way that WeChat apparently is.  A lot of what would be in

17  Slack would be duplicative of what is in email or

18  electronically-stored data, at least with respect to material

19  that is relevant to this case.

20      In particular, Momcozy has raised their interference with

21  business practices claim.  You know, it's far less likely

22  that there's going to be anything sort of unique in our Slack

23  messaging system, but that said, we are absolutely willing to

24  have that conversation and talk about a narrow way of

25  collecting from Slack as well, you know, if that makes sense.

1      THE COURT:  All right.  Thank you.

2    I will go ahead and hear from you, Mr. Roller.

3      MR. ROLLER:  Thank you, Your Honor.  I believe

4  Mr. Desai has accurately described at least my understanding

5  of how WeChat is used in China, but the critical issue that

6  the Court needs to grapple with and that very little ink has

7  been spilled over is that these accounts are not accounts

8  that Momcozy has possession, custody, or control of under

9  Rule 34.

10     And under long-held Ninth Circuit law, the party seeking

11  to obtain discovery bears the initial burden of proving that

12  a particular responsive document or communication is within

13  the possession, custody, or control of the person or entity

14  to whom the request is made, and there has been no showing of

15  that in this case.  And the reason for that is, as Your Honor

16  indicated, these are personal accounts.  WeChat is used to

17  make payments.  It's used to share social media, memes,

18  things that we in the United States might share on Twitter or

19  Facebook.  It's used to communicate, it's used as a texting

20  platform, but it is tied to an individual's personal

21  telephone number.

22     Now, there is a WeChat enterprise version, for lack of a

23  better term.  I believe it's called WeCom.  To my

24  understanding -- and I'm quite new to the case -- but to my

25  understanding, Momcozy does not use that enterprise version.

1  The closest that Momcozy uses, which is actually a lot more

2  like what Elvie uses in the Slack channel -- and I think the

3  case for Momcozy being entitled to Slack communications is

4  drastically stronger than the case that Elvie is entitled to

5  WeChat communications -- but the equivalent of that that

6  Momcozy does use is an enterprise thing called Ding --

7  D-I-N-G -- Talk.  So that kind of platform which Momcozy uses

8  is in the possession, custody, and control of Momcozy, and to

9  the extent that there are responsive communications there,

10  those would need to be produced subject to the concerns about

11  the PIPL and so forth.

12      But, here, it is an unsupported assertion that Momcozy has

13  possession, custody, or control of these individual

14  employees' WeChat messages.  You know, it's almost as if --

15  you know, sometimes my kids communicate with me by the

16  text-messaging feature of Instagram.  I have no idea why, but

17  let's say one of my law partners did that and my firm were to

18  be sued, I think that we would first need to establish that

19  the party to whom the request is directed actually has

20  possession, custody, or control of that communication, and

21  here, it simply does not.

22      And the Ninth Circuit case for the proposition that the

23  party seeking to get a certain document needs to establish

24  possession, custody, or control is *U.S. v. The International

25  Union of Petroleum and Industrial Workers*.  It's an old case,

1  870 F.2d 1450 at 1452.  It's a Ninth Circuit case from '89

2  and actually relies on cases from the '70s and before.

3  Because Elvie has not established that Momcozy has

4  possession, custody, or control of the employee WeChat

5  accounts, there really isn't anything for the Court to do.

6      Now, Momcozy has asked those parties -- those employees to

7  preserve those communications, just as we would hope that,

8  you know, relevant Elvie employees wouldn't be deleting

9  responsive text messages or even responsive Slack

10 communications, even though the Slack communications actually

11 belong to the entity, unlike those here.

12      I appreciate Mr. Desai's observations about working under

13 the PIPL.  Again, I think it's premature to get there,

14 because they've not yet met the threshold standard of

15 establishing possession, custody, or control, but there are

16 some real issues there regarding consent.  And even if

17 consent is obtained, depending if the information is sought

18 to be taken out of China, Momcozy may have to -- would have

19 to seek the approval of competent authorities in China under

20 Article 41 of the PIPL, and, you know, the penalty for

21 violation of that can be criminal, so there are serious

22 things that would need to be addressed.

23      Again, I appreciate Mr. Desai's statement about, you know,

24 not wanting to get dinner plans and scrubbing information

25 that could be potentially personal, but that is an issue we

1    would need to deal with.  The good news is we certainly don't

2    need to deal with it today, because the threshold question

3    has not yet been met that the WeChat accounts are in the

4    possession, custody, or control of my clients.

5            THE COURT:  So what about the argument, though, that

6    if you are doing business over your personal devices, you are

7    bringing those devices within the ambit of discovery?  I

8    mean, we see that all the time where people are responding to

9    work requests on Gmail or texting, and those items end up in

10   discovery.  Isn't that the same here?

11           MR. ROLLER:  It could be the same, and I would also

12   like to clarify that, you know, the 30 percent number was

13   something that was thrown out that was on the basis of one

14   new -- one employee, you know, who may have -- may have used

15   it.  It's not the group of people that's at issue here.

16       But I think that would first need to be established, and

17   there are other discovery devices that are available to Elvie

18   to determine that.  And if that, then, is determined, then

19   maybe they could meet the threshold of establishing that,

20   just as, for example, we may meet the threshold that Elvie's

21   text messages or social media posts or, you know, whatever

22   English equivalent of WeChat that may be being used could be

23   done, but we're not at that stage.

24           THE COURT:  So, then, what's your position with

25   respect to what gets you to that stage?  Are you serving

1    requests for admission or interrogatories that ask how people

2    communicate, or what's the threshold, then, that you believe

3    needs to be met before we could engage in that analysis?

4         MR. ROLLER:  Yeah, I think Elvie would need to take

5    some discovery to determine how these communications are

6    made, perhaps even, you know, something along the lines of

7    what Mr. Desai is describing about the overlap between Slack

8    and email communications.  There may be some analysis in --

9    you know, we'll produce the DingTalk records that have

10   responsive information.  There may be something that comes

11   out of that where we can say, okay, these certain

12   communications were handled on DingTalk, something else was

13   handled on WeChat.

14   I'm entirely making that up.  I do not know the facts.

15   Elvie doesn't know the facts.  But it's not something that

16   can be decided now, because that threshold has not yet been

17   met.

18   And even despite that, Momcozy has instructed the relevant

19   employees to preserve the WeChat records, so they will be

20   there if and when they're needed, if and when that threshold

21   is met, but it hasn't been met yet.

22        THE COURT:  So, for that reason, then -- because I

23   understand it's Momcozy's position that threshold has not

24   been met -- then, in your view, the Court doesn't need to

25   look to the *Owens* or *Cadence* or *Phillips* cases that basically

1  say that the PIPL is not a big hurdle to discovery under the

2  federal rules?

3          MR. ROLLER:  Exactly.  And I think, in those cases,

4  that threshold had been met.  That's the key difference.

5      I do think the *Cadence* case was wrongly decided and that

6  that may be something that we need to discuss later on, but

7  it's not something that we need to discuss today, because the

8  Court can't get there because Elvie hasn't met the threshold

9  showing that's required.

10         THE COURT:  So, then, what's the status, just

11  practically speaking, with respect to the remainder of the

12  ESI order, right?  Is this issue holding you up from getting

13  through the rest of your ESI order?  Because I don't want to

14  end up in sort of a -- I don't even know what the right

15  analogy is -- but some sort of chicken-egg issue where we

16  don't engage in discovery because we don't have an ESI order,

17  and yet, we can't agree on an ESI order because we have not

18  engaged in sufficient discovery.  Does that make sense?

19         MR. ROLLER:  Yes.  I'm the latest to this party, so I

20  should probably defer to others, but my understanding is

21  that, for the most part, the remainder of the ESI order has

22  been resolved.

23         THE COURT:  Okay.  Maybe I'll return to Mr. Desai and

24  let him comment on some of the things that you raised.

25      And also, just practically speaking, is this just a timing

1    issue?  Do we need to table this issue before we take in some

2    discovery?

3        Thank you, Mr. Roller.

4        MR. DESAI:  I think that's accurate that this is the

5    major sticking point.  I think there's a red line of the

6    agreement going back and forth between the parties, and so I

7    can't say specifically whether there's agreement on

8    everything else, but I can say that this seems to be the main

9    issue.

10       If I could, I'll just address a couple of things that

11   Mr. Roller raised.  One is that, you know, if it is the case

12   that -- as Your Honor sort of alluded to, if it is the case

13   that your business executives and high-ranking employees of a

14   company can use their personal device for 30 percent of their

15   business communications and that somehow creates a shield to

16   discovery because of possession, custody, or control, I mean,

17   that becomes a pretty big loophole in e-discovery, the idea

18   that we haven't established possession or custody or control.

19   I mean, if they are executives and employees of the company

20   and they are conducting 30 percent of their business

21   communications over their personal devices, and, as

22   Mr. Roller is pointing out, the company is able to direct

23   them to preserve their messages, I'm not sure what else we

24   have to show to determine that their messages are in

25   Momcozy's possession, custody, and control.

1      "Possession" is construed broadly, and to the extent these

2  are employees and executives of named plaintiffs and

3  defendants who are using their personal -- who are choosing

4  to use their personal device as a business communication

5  platform, they absolutely -- those messages are absolutely in

6  the possession, custody, or control of the company,

7  particularly when they can direct them to preserve them.

8          MR. ROLLER:  If I may, Your Honor, to the extent I

9  used the word "direct," that was a mistake, and I'm not

10  certain whether I said that.  What I should have said is

11  Momcozy has asked and the employees have agreed to preserve

12  those materials.  So I understand Mr. Desai's point, but I

13  don't think it's well-taken here.

14      Again, I apologize to the Court and counsel on the phone.

15  I was not part of this litigation when the 30-percent comment

16  was made, but my understanding is that was based off of one

17  employee.  It was a young employee, very new to the company,

18  and I don't think that should be taken as the gold standard.

19      Some discovery needs to be taken about how communications

20  are done and whether WeChat would potentially have a lot of

21  responsive information or if, as Mr. Desai has said, it's

22  likely to be duplicative of the email communications or the

23  DingTalk communications, just as Mr. Desai has said their

24  Slack channel is duplicative of their emails.

25          THE COURT:  So I don't think the 30 percent -- I

1    mean, that's -- I understand.  I appreciate that

2    clarification, Mr. Roller, with respect to the quantity of

3    the emails, but I think you could agree, though, that if any

4    level of business is being conducted over WeChat, there may

5    be discoverable information in those communications.  I'm

6    assuming Momcozy has issued a litigation hold or something to

7    that effect asking parties not to delete otherwise

8    discoverable information or relevant and potentially relevant

9    information.

10    Mr. Desai, what's your response with respect to timing?

11    Like, what's the downside in issuing some discovery to lay

12    this foundation and explore the question of the scope of

13    additional electronic communications, as needed?

14    I'm a little reluctant to say, well, it would be

15    burdensome or disproportionate to search the WeChat channels

16    when we don't have any sense of what volume we're talking

17    about.  You know, everything is disproportionate and

18    burdensome if you haven't looked at it yet, so I'm

19    disinclined to say, well, this WeChat should be off the table

20    altogether, particularly in light of other decisions and just

21    the common-sense reality that we face with electronic

22    communications and the intertwining issues that we encounter

23    with our personal devices and accounts.

24    So I don't think the threshold is very high, but I'm

25    curious to know, if the parties can reach agreement without

1   the Court having to issue an order, that's always preferable

2   in terms of resolving these issues, especially these early

3   stages in the litigation.

4       So is there -- and this question is for both of you -- a

5   timing and discovery solution here that could lay a threshold

6   that would inform the parties -- or lay a foundation that

7   would inform the parties in how to reach agreement on these

8   final issues in the ESI order?

9           MR. DESAI:  So, from our perspective, I think I have

10  two points on that.  One is that I feel like, you know, sort

11  of establishing -- or putting the burden on Elvie to

12  determine that, what is unquestionably a source of ESI that

13  has relevant business communications, is within the scope of

14  ESI, electronically-stored information, of Momcozy, so is

15  kind of the opposite.

16      Really, we've already talked about business communications

17  occurring on this platform.  That is electronically-stored

18  information.  If there's a reason that information should not

19  be collected from that source, the burden should be on

20  Momcozy to file a protective order explaining why it should

21  not be collected.  And I think the model ESI agreement

22  actually alludes to that, because it talks about the parties

23  exchanging sources of additional information, you know, like

24  phones and things like that.

25      So I feel like it's sort of -- I don't know, is "cart

1    before the horse" the right analogy?  I'm not sure, but it's

2    flipping things around.

3        But the other issue on your timing question, Your Honor,

4    is that we have served quite a bit of discovery in this case

5    already, and we have not gotten answers.  We have not had any

6    documents produced to us.  We have not really had any

7    meaningful answers to our interrogatories that are

8    outstanding.

9        And so we have a concern that this case is not -- that

10   we're not able to move this case along as quickly as we would

11   like, and so that's the reason why we were hoping to

12   short-circuit this by coming to an agreement with Momcozy,

13   and when that wasn't possible, we sought guidance from the

14   Court.

15        THE COURT:  That makes sense.  And you answered my

16   question, which was -- I guess I could have asked it more

17   directly, but is there discovery outstanding already?  So you

18   are already in discovery.

19        MR. DESAI:  We are.

20        THE COURT:  Presumably, have you asked for discovery

21   that implicates these WeChat messages, or is this discussion

22   in the ESI context sort of in a vacuum?

23        MR. DESAI:  I can't say for sure whether we -- I know

24   we have something like 65 RFPs out, something like 20

25   interrogatories out, but I can't say for sure whether there's

1    one on this issue particularly.  Really, this issue has come

2    up in the context of negotiating the ESI agreement, and so I

3    guess, yeah, you know, it's likely that maybe this has been

4    caven to this negotiation, this discussion.

5         THE COURT:  Okay.  Mr. Roller, do you have any

6    response to that?  It seems as though, if discovery has been

7    produced and there are sources of information that are likely

8    to lead to the discovery of admissible evidence, you know, in

9    the normal course, these would be included, right?  These

10   would be included within the ambit of discovery if people are

11   doing business on their personal devices or accounts.  Tell

12   me why you shouldn't have to move for a protective order to

13   avoid having to search these accounts.

14        MR. ROLLER:  Because I don't -- I mean, do some

15   communications happen over WeChat?  Probably, just like some

16   communications happen in every business over text.  We're

17   not -- we're not asking that they search their employees'

18   texts.  Maybe we should do that.  Maybe -- you know, we're

19   not even asking that Slack be searched at this point.  Maybe

20   we should do that.

21     We're taking the approach that, let's get the core

22   discovery out.  If there is a -- if it is shown that there

23   are materials that would only have been shared through

24   WeChat, through discovery devices, then we can circle back to

25   that issue, but that has not yet been established.

1    I don't believe there are any RFPs that go directly to

2    WeChat messages.  I'm not going to tell the Court or counsel

3    that there's nothing in WeChat that would be responsive -- I

4    don't know -- but I don't believe they've met that threshold

5    to establish that these WeChat accounts are in Momcozy's

6    possession, custody, or control, just as we have not yet met

7    the threshold that their employees' text messages or

8    Instagram accounts or, you know, whatever instant-messaging

9    features they're using are within their custody or control

10   yet.

11       As to the status of discovery, my understanding is that a

12   chunk of responsive documents will go out next week and that

13   we anticipate the bulk of the remaining documents that are

14   responsive and that we've agreed to produce will go out

15   within a month.

16           THE COURT:  Okay.  Well, I'm heartened to hear that

17   this process has not held you up in terms of proceeding with

18   discovery on other issues on which there is agreement.

19       So here's what I'm going to do:  I don't want to rule on

20   discovery requests in a vacuum that I haven't seen, but I

21   will tell you that I am inclined to grant Elvie's request to

22   have these accounts be subject to discovery.

23       It sounds like there is at least some concern and some

24   substantiated allegation that there is some level of business

25   that's being conducted that would at least require a

1   good-faith search in the normal course.

2       I would encourage the parties to try and keep working on

3   this issue, if you can.  However, I think, procedurally, I'm

4   not going to make you come back again, you know, for another

5   informal conference, but I did want to give you the benefit

6   of my thinking.

7       And then, procedurally, what I think needs to happen is,

8   Mr. Roller, if you look at the discovery requests and

9   believe -- and I understand you're new to the case, so I'm

10  not asking you to recite them -- but if you look at them and

11  believe, based on the Court's opinion that these messages are

12  likely implicated, that a protective order is necessary

13  because they are burdensome or because they are truly not

14  within the custody and control of Momcozy, or on the face of

15  those requests that are currently outstanding, that they have

16  not met their burden, then you can certainly file that

17  motion, and the Court will entertain that motion and then can

18  rule on it with a full record, the requests and any authority

19  you want to cite.  So you'll have the opportunity to do that.

20      I do think, because discovery has been issued, that that's

21  the posture we're now in.  If you believe that, on the face

22  of that discovery, that Elvie has not met their burden with

23  respect to establishing that those accounts are discoverable,

24  then you can certainly move for that protective order and

25  bring that to the Court's attention for a more fulsome

1   discussion, and then that is where the Court would look at

2   the concerns that at least have been alluded to under the

3   PIPL.

4       Does that make sense?

5           MR. ROLLER:  Yes, Your Honor.

6           THE COURT:  In the interim, if the parties are able

7   to reach an agreement in light of this discussion, obviously,

8   that's the preferred outcome, but I'm not going to prohibit

9   anybody from filing a motion that enables the Court to have a

10  more thorough opportunity to look at the actual discovery

11  requests to the extent you believe the burden has not been

12  met.

13      Mr. Desai, do you have any comments?  You looked like you

14  were going to say something.

15          MR. DESAI:  No, Your Honor, that's clear.

16          THE COURT:  Okay.  Mr. Roller, any final thoughts?

17          MR. ROLLER:  No.  It is clear.

18      One thing that we were interested in raising and previewed

19  in our response brief on the motion to amend is,

20  particularly, if the motion to amend is granted, Momcozy

21  believes a significant extension of the case schedule is

22  going to be necessary.  Rather than, you know, rush to file a

23  cross-motion that may not be necessary, we thought it might

24  make sense, while all the parties are here, just to raise

25  that and ask, if that motion to amend is granted -- and

1    candidly, the basis upon which Momcozy opposes it is the

2    prejudice based on the enlargement of the case, which could

3    be remedied by an extension.

4        We just wonder how the Court would like that issue to be

5    presented.  Should it be presented in a contested motion?

6    Should the parties confer and do something equivalent to an

7    LCR 37 expedited motion that sets forth their positions?

8    Just trying to think about the most efficient use of the

9    Court's and the parties' time.

10           THE COURT:  I appreciate that very much.  So I guess

11   you're asking if the parties disagree with respect to

12   extending the case schedule?  Is that -- or are you asking

13   now -- and I have not -- the motion was ripe as of, like, an

14   hour ago, so I have no comment on the motion yet.

15       But are you asking, Mr. Roller, if the Court grants the

16   motion, then how to address the enlargement of the case

17   schedule, or are you saying, let's talk about enlarging the

18   case schedule right now because that may relieve or resolve

19   your opposition to the motion itself?

20           MR. ROLLER:  I think the latter is true, but the

21   former is what I was asking, in that if the motion to amend

22   is going to be granted, given that the basis of our

23   opposition would be prejudice arising from the enlargement of

24   the case, we were wondering if the Court would prefer --

25   because the parties have discussed an enlargement, and Elvie

1   has indicated some appetite for an extreme modest extension,

2   but not the type of extension we believe would be necessary.

3   How would the Court prefer that issue be presented, in a

4   contested motion or in something akin to what we're doing

5   here or the LCR expedited procedure, which, again, is

6   typically for discovery disputes --

7          THE COURT:  Sure.

8          MR. ROLLER:  -- but, for something like this, may

9   make sense.

10          THE COURT:  I mean, ideally, the parties could agree

11   on an extension of the case schedule, of course.  That's

12   always the ideal.  And, please, if the parties do agree on

13   that such that it resolves your opposition to the motion to

14   amend, please just do let chambers know.  You can email

15   Ms. Staples and let her know.  At this point, if the parties

16   have agreed to an extension of the case schedule of a certain

17   length -- and I understand that you have not yet -- but if

18   you are able to, then let us know, and then we can issue a

19   new case schedule.

20      To the extent as to how to let the Court know if you have

21   disagreements on what any extension of the case schedule

22   would look like, then I would say just filing a contested

23   motion would be the easiest way to bring that before the

24   Court.  And if there's some reason that needs to be

25   expedited, you need to let us know in the papers for sure.

1          MR. ROLLER:  Thank you.

2          THE COURT:  All right.

3          MR. DESAI:  And I guess I have a follow-up question

4   on that, Your Honor, because it seems like the opposition to

5   our motion for leave to amend is sort of premised on this

6   idea that there is prejudice -- there would be prejudice to

7   Momcozy if the case is not enlarged.  If that's the only

8   basis for objecting to the motion for leave and we're

9   separately going to address the dispute we have about the

10  current case schedule, you know, my view is that maybe we

11  can -- you know, we're interested in getting the motion for

12  leave sorted out so that we know the appropriate scope of the

13  case.  So that's one point.

14      The other thing is, on this issue on prejudice from the

15  enlargement of the case, you know, I didn't appreciate that

16  that is the argument here, that Momcozy was not aware of the

17  potential scope of the case when we negotiated the original

18  schedule, but they absolutely were.  We have been transparent

19  that we intended to add additional patents when they issued

20  from the Patent Office.  We've been transparent that we were

21  planning to add products, and we had informed Momcozy of that

22  at the time we were negotiating the original schedule.

23      So, at that time, if they believed that there was some

24  prejudice with respect to the schedule that we negotiated, at

25  that time, they should have said that, "Well, actually,

1   instead of, you know, a 900-day schedule, we need a 1,200-day

2   schedule."  You know, we didn't catch them by surprise with

3   this.  We have been completely transparent, so the prejudice

4   argument, I think, as the reason for enlarging the case is

5   misplaced.

6           THE COURT:  Okay.  Well, I appreciate that, and like

7   I said, the Court has not seen the motion to amend yet.  It

8   just became ripe today, so I can take up that issue at the

9   appropriate time.  My comment was more, if it's the timing

10  that is the holdup on the motion to amend and the parties are

11  able to agree to a timing that works to alleviate that

12  pressure, then let us know that.

13          MR. DESAI:  Right.

14          THE COURT:  And we can issue a schedule accordingly.

15  Otherwise, you know, we'll rule on the motion to amend in the

16  due course and then address any schedule adjustments that the

17  parties bring to our attention.  Okay?

18      Have we addressed all the issues we need to get through

19  today?

20          MR. DESAI:  Yes, I think that's it.

21          MR. ROLLER:  Yes.

22          THE COURT:  Thank you.  We'll be in recess.

23          MR. JACOBS:  Thank you.

24          MR. YANG:  Thank you.

25                  (Adjourned.)

1
2                    C E R T I F I C A T E
3
4
5      I, Sheri L. Schelbert, RMR, CRR, do certify that the
6    foregoing is a correct transcript, to the best of my ability,
7    from the record of proceedings in the above-entitled matter.
8
9
10    */s/ Sheri Schelbert*
11    Sheri Schelbert
12
13
14
15
16
17
18
19
20
21
22
23
24
25